AO 91 (Rev. 11/82)                                                                           **CRIMINAL COMPLAINT**                                      ORIGINAL

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>RAYMOND GHALOUSTIAN | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br>19MJ04022 |

Complaint for violation of Title 18, United States Code, Section 922(g)(1) (felon in possession of a firearm)

| NAME OF MAGISTRATE JUDGE<br>THE HONORABLE ALKA SAGAR | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br>August 31, 2019 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[18 U.S.C. § 922(g)(1)]

On or about August 31, 2019, in Los Angeles County, within the Central District of California, defendant RAYMOND GHALOUSTIAN knowingly possessed a firearm and ammunition, specifically a Ruger model LCP 2 handgun, bearing serial number 380016495, and seven rounds of .380 caliber ammunition, which had been shipped or transported from one state to another, in violation of Title 18, United States Code, Section 922(g)(1). At the time GHALOUSTIAN possessed the firearm, GHALOUSTIAN had been convicted of the felony crimes described in the attached affidavit, which are punishable by a term of imprisonment exceeding one year.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>**JOHN HACKMAN**<br>OFFICIAL TITLE<br>Special Agent – ATF |
|---|---|

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) | ALKA SAGAR | DATE<br>September 24, 2019 |
|---|---|---|

(1) See Federal Rules of Criminal Procedure 3 and 54

AUSA Marina A. Torres x8231     REC: Detention

**AFFIDAVIT**

I, John Hackman, being duly sworn, declare and state as follows:

## I.   PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint and arrest warrant against RAYMOND GHALOUSTIAN ("GHALOUSTIAN") for a violation of 18 U.S.C. § 922(g)(1)): Felon in Possession of a Firearm.

2.   This affidavit is also made in support of an application for a warrant to search five digital devices (collectively, the "SUBJECT DEVICES"), in the custody of Los Angeles Police Department ("LAPD"), in Van Nuys, California, as described more fully in Attachment A.

3.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substances) and 846 (conspiracy and attempt to distribute controlled substances) and 18 U.S.C. §§ 922(g) (prohibited person in possession of a firearm), 924(c) (possession of a firearm in furtherance of a drug trafficking crime), 371 (Conspiracy), 1028 (Fraud and Related Activity in Connection with Identification Documents, Authentication Features, and Information), 1029 (Access Device Fraud), 1344 (Bank Fraud), and 1028A (Aggravated Identity Theft) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and

information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5. I am a Task Force Officer ("TFO") with the United States Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). I am also a police officer for the city of Los Angeles, and I have been so employed for approximately 12 years. I am currently assigned to Metropolitan Division Crime Impact Team and am tasked with investigating serial crimes, violent crimes, and crimes involving weapons. I was previously assigned as a Gang Enforcement Officer at Southwest Division and Devonshire Division. I have received training in, and I have conducted, investigations of offenses involving narcotics trafficking and the illegal sale, possession and use of firearms. Through my training and experience, I am familiar with the ways in which people who are prohibited from possessing firearms acquire, possess, and conceal firearms and ammunition, and the ways in which drug traffickers use firearms to safeguard their products and facilitate their trafficking.

### III. SUMMARY OF PROBABLE CAUSE

6.      On or about August 31, 2019, Los Angeles Police Department Officers ("LAPD") pulled over a car that GHALOUSTIAN was driving that had no front license plate. GHALOUSTIAN consented to a pat-down and officers found a handgun in his waistband. An ATF expert determined that the gun had moved in interstate or foreign commerce. Officers continued to search GHALOUSTIAN and found approximately 29.14 gross grams of suspected methamphetamine in his pants pocket. In the car GHALOUSTIAN was driving, officers found several access cards and a skimming device. GHALOUSTIAN is a convicted felon. Officers found one of the SUBJECT DEVICES on GHALOUSTIAN, two on the passenger, Hakop Keloyan ("Keloyan"), and the remaining two SUBJECT DEVICES in the car.

### IV. STATEMENT OF PROBABLE CAUSE

7.      Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.    August 31, 2019 Traffic Stop**

8.      On or about August 31, 2019, LAPD officers Kevin Moore and Andrew Green were on patrol in the area of Sherman Way and Allot Avenue in Van Nuys, California, an area known for narcotics and illicit gang activity. They were wearing full police uniform, and driving a dual-purpose vehicle.

9.      While patrolling behind a Studio Inn Motel, located at 13561 Sherman Way Avenue, officers saw a black 2019 Mercedes model S500 vehicle, with license plate number 8KWX059 (the

3

"Mercedes"), in the rear of the location. Officers Moore and Green saw two men (later identified as GHALOUSTIAN and Keloyan get into the vehicle and put the vehicle into reverse. Officers also saw that the vehicle did not have a front license plate, in violation of California Vehicle Code Section 5200(a).

10. The vehicle drove to the intersection of Sherman Way and Allot Avenue, where the officers initiated a traffic stop. Officers Moore and Green asked GHALOUSTIAN and Keloyan to step outside of the vehicle and onto the sidewalk. GHALOUSTIAN stepped out of the driver's side of the car, and Keloyan stepped out of the passenger side. Officer Green asked them to face the wall of the building, with their hands behind their back. GHALOUSTIAN and Keloyan did so.

**B.   Gun found on GHALOUSTIAN**

11. While Officer Moore proceeded to the vehicle, Officer Green approached GHALOUSTIAN and asked him if he had any weapons on him. GHALOUSTIAN asked why, and, while shaking his head in the negative, said he did not. Officer Green responded that he had asked for officer safety. Officer Green asked GHALOUSTIAN if he was on parole or probation, to which GHALOUSTIAN responded that he was not.

12. Officer Green then asked GHALOUSTIAN, "Do you mind if I check you to make sure you have no guns?" GHALOUSTIAN said yes, giving consent. Officer Green proceeded to pat down GHALOUSTIAN and immediately recognized the handle of a black handgun protruding from GHALOUSTIAN's front waistband. Officer Green retrieved the hand-gun, a Beretta model 92FS handgun

4

(obliterated serial number) with black plastic grips, one round of 9mm ammunition in the chamber and six rounds of 9mm ammunition in the magazine, from GHALOUSTIAN's waistband and ordered GHALOUSTIAN to the ground. Officer Moore ordered Keloyan to the ground. Both GHALOUSTIAN and Keloyan were placed in handcuffs.

### C. Drugs Found on GHALOUSTIAN; Another Gun, Drugs, and Access Devices Found in Vehicle

13. In a search incident to GHALOUSTIAN's arrest, Officer Green recovered a Newport cigarette package in GHALOUSTIAN's front left pocket that contained a clear plastic baggie with a large amount of white crystal-like substance resembling methamphetamine.

14. Officer Green recovered approximately 18 grey cards that resembled credit cards (with a black magnetic strip on one side, and five-digit numbers written on each one) from GHALOUSTIAN's front left pocket and GHALOUSTIAN's wallet, which was pulled from his left rear pants pocket. Officer Green also recovered approximately $1,626 in U.S. currency from GHALOUSTIAN's wallet.

15. Officer Moore asked Keloyan if they would find anything in the vehicle. Keloyan said that GHALOUSTIAN had been driving the vehicle for the past couple of days, so he did not know what was in the vehicle.

16. During their search of the ~~vehic~~Mercedes incident to GHALOUSTIAN's arrest, officers found an additional firearm in a compartment located behind the rear seat drink holder, covered

5

by an empty plastic bag. This firearm, a Ruger model LCP 2 handgun with serial number 380016495 and black plastic grips, had an empty chamber and seven rounds of .380 ammunition in the magazine.

17. Officer Moore found a cigarette box containing a small plastic baggie with a crystal-like substance resembling methamphetamine in the center console of the vehicle.

18. Officer Moore also found a white plastic grocery bag containing a large number of the grey credit cards, as well as a metal box that contained wires from a credit card skimming machine, in the trunk of the vehicle.

### D. SUBJECT DEVICES found on GHALOUSTIAN, Keloyan, and in the Mercedes.

19. Officers recovered the five SUBJECT DEVICES from GHALOUSTIAN's and Keloyan's person, as well as from the Mercedes. One black Samsung Galaxy S8 cell phone was recovered from GHALOUSTIAN's person. One black Apple iPhone and one grey Apple iPhone were recovered from Keloyan's rear right pocket. One black Apple iPhone and one blue LG flip phone (serial number 505CYBD349509) were recovered from the Mercedes.

### E. Vehicle Registration

20. Using law enforcement databases, I confirmed that the vehicle was registered to Keloyan's wife, Marine Keloyan.

### F. Criminal History

21. On September 12, 2019, I reviewed certified conviction documents for GHALOUSTIAN and learned that GHALOUSTIAN, prior to August 31, 2019, has previously been convicted of the following

felony crimes punishable by a term of imprisonment exceeding one year:

  a. One felony conviction for Unlawful Taking or Driving of a Vehicle in violation of California Vehicle Code Section 10851(a), in the Superior Court for the State of California, County of Los Angeles, Case Number LA084543, on or about November 10, 2016; and

  b. One felony conviction for Possession of Controlled Substances in violation of California Health and Safety Code Section 11350(a), in the Superior Court for the State of California, County of Los Angeles, Case Number GA053139, on or about March 15, 2004.

  **G.** **Drug Test**

  22. The suspected methamphetamine was later processed, weighed (29.68 grams total), and logged into LAPD property and evidence. Per LAPD policy, for officer safety, the suspected methamphetamine was not field tested. The suspected methamphetamine will be submitted to the DEA Laboratory for testing shortly. Based on my training and experience, I believe that the suspected methamphetamine is in fact methamphetamine or another controlled substance because of its appearance, packaging, and the way in which it was stored, among other things.

  **H.** **Interstate Nexus**

  23. On September 16, 2019, SA Mark Davis, an ATF Interstate Nexus Expert, examined the handgun and confirmed that the handgun seized from GHALOUSTIAN was manufactured outside of

the State of California. Because the handgun was found in California, I believe that it has traveled in and affected interstate commerce.

## V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

24. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

   a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

   b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

   c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion

of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

        d. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

## VI. TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

25. From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

        a. Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices. It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals. Such information is also kept on digital devices.

   b. Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices. These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

   c. Those who illegally possess firearms often sell their firearms and purchase firearms. Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices. This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price. In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

   d. Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VII. TRAINING AND EXPERIENCE REGARDING BANK FRAUD, IDENTITY THEFT, AND ACCESS DEVICE FRAUD

26. Based on my training and experience and information obtained from other law enforcement officers who investigate bank fraud and identity theft crimes, I know the following:

    a. People involved in bank fraud, identity theft, and access device fraud crimes often collect checks, access devices, other personal identifying information (such as names, Social Security numbers, and dates of birth), and identification documents belonging to other people that they can use to fraudulently obtain money and items of value. It is a common practice for those involved in such crimes to use either false identification or stolen real identification to make purchases with stolen access devices at in order to avoid detection and to complete the transaction. Those who engage in such fraud keep evidence of such fraudulent transactions.

    b. It is common for identity thieves, and individuals engaged in bank fraud, access device fraud, and identification document fraud to use equipment and software to print credit and identification cards, to create magnetic strips for credit cards, to use embossing machines to create credit cards, to use laser printers to create checks, and to use magnetic card readers to read and re-encode credit cards. Software relevant to such schemes can often be found on digital devices, such as computers. Such equipment and software are often found in the thieves' possession as they can be small and easily portable.

c. It is common practice for individuals involved in identity theft, bank fraud, and access device fraud crimes to possess and use multiple digital devices at once. Such digital devices are often used to facilitate, conduct, and track fraudulent transactions and identity theft. Suspects often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet. They often employ digital devices for the purposes, among others, of: (1) applying online for fraudulent credit cards; (2) obtaining or storing personal identification information for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal information; (4) keeping records of their crimes; (5) researching personal information, such as social security numbers and dates of birth, for potential identity theft victims; (6) verifying the status of stolen access devices; and (7) coordinating with co-conspirators.

d. Based on my training and experience, I know that individuals who participate in identity theft, bank fraud, and access device fraud schemes often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators in order to conduct their business. Oftentimes, they do so on their digital devices. Suspects often use their

12

digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos.

## VIII. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

27. As used herein, the term "digital device" includes the SUBJECT DEVICES.

28. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are

not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

    c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

    d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

29. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

    a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel

may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

30. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

    a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

    b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after

15

a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

        c.    The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress GHALOUSTIAN's and/or Keloyan's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of GHALOUSTIAN's and/or Keloyan's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

        d.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

\\
\\
\\
\\
\\
\\
\\
\\
\\
\\

## IX. CONCLUSION

31. For all of the reasons described above, there is probable cause to believe that GHALOUSTIAN has committed a violation of 18 U.S.C. § 922(g)(1)): Felon in Possession of a Firearm. There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

_____
JOHN HACKMAN, Task Force Officer
Bureau of Alcohol, Tobacco, Firearms and Explosives

Subscribed to and sworn before me this 24th day of September, 2019.

_____
UNITED STATES MAGISTRATE JUDGE
ALKA SAGAR